## Case No. 12,793.

### In re Accounts of the SHIPPING COM'R OF PORT OF NEW YORK.

[16 Blatchf. 92.] [1]

Circuit Court, S. D. New York. March 24. 1879.

#### SHIPPING COMMISSIONER — PORT OF NEW YORK — ACCOUNTS — SALARIES OF DEPUTIES.

1. The question of the salaries of employees in the office of the shipping commissioner of the port of New York, considered.

[Cited in Re Accounts of Shipping Com'r of New York. 17 Fed. 139, 20 Fed. 212.]

2. The question of allowing to be paid out of the receipts of the office in one year, expenses incurred in the previous year, and not then paid because the receipts of that year were not large enough for the purpose, considered.

3. The shipping commissioner has, under section 4505 of the Revised Statutes of the United States, the power to appoint clerks with the title of deputy commissioners.

Objections to master's report.

Stewart L. Woodford, Dist. Atty., for the United States.

Erastus C. Benedict, for shipping commissioner.

BLATCHFORD, Circuit Judge. The items and principles of the accounts of the shipping commissioner, in regard to expenses, for the years 1872, 1873, 1874, and 1875, were examined and approved by the master to whom such accounts were referred, and his report thereon was confirmed, on notice to the United States attorney, by an order made by Judge Johnson on the 9th of January, 1877, and said order authorized the shipping commissioner to charge, as against the fees received in his office, the expenses set forth in said report as expenses of his office. The United States attorney filed no exceptions to such report. That report showed that Deputy C. D. Duncan received $1,000 salary for 21 weeks in 1872, $3,500 salary for the year 1873, $3,900 salary for the year 1874, and $4,000 salary for the year 1875; that Deputy G. F. Duncan received $645 salary for 21 weeks in 1872, $3,000 salary for the year 1873, $3,900 salary for the year 1874, and $4,000 salary for the year 1875; and that Deputy F. C. Duncan received $900 salary in the year 1873, $3,900 salary for the year 1874, and $4,000 salary for the year 1875. In regard to those salaries, the shipping commissioner stated, under oath, before the master, November 1, 1876, as follows: "The salaries paid to my deputies were the result of an understanding with Judge Woodruff. There is no fund but the fees of this office, out of which its expenses can be paid. The amount of that fund yearly is uncertain and irregular, while certain of the office expenses, such as commissioner's salary, rent, salaries of the clerks and outdoor men, are necessarily fixed, and should be paid. It was, there-

---

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]

fore, arranged with all the deputies, that, after paying all such fixed expenses, the balance of fees should be apportioned among them, not, however, to exceed $4,000 for any one year. By this arrangement, the deputies, in engaging for each year, have never known what their salary would amount to until the year ended, and they have received, in this way, salaries varying from $2,400 to $4,000. This year," that is, 1876, "the business of the office has been very much below that of any previous year. So far, my sons have had to be content with sums, or pay," for 1876, "averaging a rate of $1,400 each per year, and Mr. Pentz with $200 per month, or at the rate of $2,400 per year. I have graded them according to their necessities. Their duties were about equal, and, in doing even this, I have had to give up about $1,500 or my own salary. There is no means of knowing what the remaining two months of the year will do to improve our finances, but this is the situation at the end of ten months already passed." Mr. Pentz, referred to, was chief deputy, and received in 1872, 1873, 1874, and 1875, the same salaries as C. D. Duncan. There was another deputy, Mr. Jenks, who received in 1872 (for 21 weeks) $1,000 salary; in 1873, $1,322.52 salary; and in 1874 (for 49 weeks), $1,225 salary. There was another deputy, Mr. Kingsbury, who received, in 1872 (for 21 weeks), $1,000 salary. There was another deputy, H. E. Duncan, who received, in 1873, $3,000 salary; in 1874, $3,900 salary; and in 1875, $4,000 salary. There were thus, in all, 5 deputies in 1872; 6 in 1873; 6 in 1874; and 5 in 1875. In 1872, the salaries to deputies (for 21 weeks) were $4,645; in 1873, $15,222.52; in 1874, $20,725; and in 1875, $20,000. There was also a bookkeeper, who received, in 1872 (for 21 weeks), $525 salary, in 1873, $1,350 salary; in 1874, $1,375 salary; and in 1875, $1,325 salary. There were, in 1872, 6 clerks, who received (for 21 weeks) $2,559 salary; in 1873, 7 clerks, who received $4,948.52 salary; in 1874, 12 clerks, who received $9,688 salary; and in 1875, 10 clerks, who received $8,372.66 salary. There were, in 1872, 12 outdoor officers, who received (for 21 weeks) $3,965.60 salary; in 1873, 10 outdoor officers, who received $5,559 salary; in 1874, 6 outdoor officers, who received $4,798 salary; and in 1875, 6 outdoor officers, who received $5,274.50 salary. There was, in 1872, one watchman who received $10 salary. There were in 1872, one messenger, who received $99 salary; in 1873, 2 messengers, who received $98 salary; in 1874, 2 messengers, who received $374 salary; and in 1875, 2 messengers, who received $671 salary. There were in 1872, one boy, who received $3 salary; in 1873, one boy, who received $2 salary; in 1874, one boy, who received $59 salary; and in 1875, one boy, who received $29 salary. The commissioner himself appears to have had, as salary, in 1872, $2,500; in 1873, $5,000; in 1874, $5,000; and in 1875, $5,000. In 1872, the receipts

were $20,303.50, and the expenses $20,960.50, creating a deficiency of $657. In 1873, the receipts were $37,765.15, and the expenses (including said $657) were $39,191.25, creating a deficiency of $1,426.10. In 1874, the receipts were $54,826, and the expenses (including said $1,426.10) were $54,699.88, leaving a surplus of $126.12. In 1875, the receipts (including said $126.12) were $51,361.12, and the expenses $51,794.54, creating a deficiency of $433.42. The order of January 9, 1877, must be regarded as sanctioning the charge of the foregoing expenses against the fees, and the principle set forth as to the fixed expenses and the salaries of the deputies, and the propriety of paying a deficiency of one year out of a surplus of a succeeding year. It is, of course, always open to the district attorney to show that any particular expenses or salaries are too large, if he raises the point at a proper time and in a proper manner.

The shipping commissioner filed, on the 11th of January, 1877, his detailed report of receipts and expenditures for the year 1876. It showed the receipts for the year 1876 to have been $30,576.25, and the expenses (including the said deficiency of $433.42 at the end of 1875) to have been $31,149.03, leaving a deficiency, at the end of 1876, of $572.78. The salaries paid in 1876 were as follows: C. C. Duncan, commissioner, $4,275.51; John H. Pentz, deputy, $2,450; C. D. Duncan, deputy, $2,450; F. C. Duncan, deputy, $2,450; G. F. Duncan, deputy, $2,450; H. E. Duncan, deputy, $1,100; one bookkeeper, $1,300; 6 clerks, $2,274.32; 7 outdoor officers, $2,631; one messenger, $170; and four boys, $293. The master to whom it was referred to examine said account and report in reference thereto, reported, in his report filed February 14, 1877, that he had been attended by the shipping commissioner and the district attorney, and had examined the shipping commissioner under oath, respecting said accounts, and had carefully investigated their details, and had examined the vouchers, 472 in number, for the items of expenditure, and had passed said account, leaving said debit of $572.78. No order has ever been made confirming said report, or acting thereon, nor has the district attorney filed any exception thereto.

The shipping commissioner filed, early in 1878, his detailed report of receipts and expenditures for the year 1877. It showed the receipts for the year 1877 to have been $28,650.25, and the expenses (including the said deficiency of $572.78, at the end of 1876) to have been $28,870.58, leaving a deficiency, at the end of 1877, of $220.33. The salaries paid in 1877 were as follows: C. C. Duncan, commissioner, $5,000; F. C. Duncan, deputy, $3,800; G. F. Duncan, deputy, $3,800; John H. Pentz, deputy, $1,400; C. D. Duncan, deputy, $1,900; one bookkeeper, $1,360; 4 clerks, $2,587.50; 5 outdoor officers $2,258.50; one engineer and messenger, $155; and 3 boys $298.

The master to whom it was referred to examine said account and report in reference thereto, reported, in his report filed February 26, 1878, that he had been attended by the shipping commissioner and the district attorney, and had examined the shipping commissioner under oath, in a deposition annexed, and had carefully investigated the details of said account, and had examined the vouchers, 451 in number, for the various items of expenditure therein, and had passed said account, leaving said debit of $220.33.

On the 6th of March, 1878, the United States, by the district attorney, filed exceptions to said report filed February 26, 1878, to the effect, that, upon said deposition of the shipping commissioner, the master should have reported that the salaries paid to the three deputy commissioners, F. C. Duncan, G. F. Duncan and C. D. Duncan, at the rate of $3,800 per year each, were entirely too large for the work performed by them; that the item of $572.78, deficiency at the end of 1876, should not have been allowed as a charge against the receipts of 1877; that it appears, from said deposition, that the deputy shipping commissioners' duties at the port of New York consist only of shipping and discharging sailors; that there was but one person apprenticed to sea service during 1877; that the power of the shipping commissioner to employ clerks, granted to him by § 4505 of the Revised Statutes, does not authorize the appointment of deputy commissioners; that it appears from the accounts of said shipping commissioner on the files of this court, that the receipts of said shipping commissioner have amounted to various sums from $28,000 to $50,000 a year, and have been entirely consumed by the charges of said commissioner; that it appears to be the practice of said commissioner to make such a disposition of the receipts of the office as to use them up; that the salaries of the deputy commissioners were $2,500 each for the year 1876, and $3,800 each for the year 1877; and that the commissioner undertakes to explain such increase in salaries by stating that the salaries are flexible and states no other reason therefor.

In the deposition referred to the shipping commissioner testifies as follows, on his direct-examination: "From the time of my first appointment, in 1872, when the shipping law took effect, I consulted with Judge Woodruff at every step. The rental of the offices, the salaries of the deputies and other employees, were arranged with his full knowledge and consent. The expenses of the office could only be borne out of the fees, which were fluctuating, and it was decided, that, while certain expenses, such as rental, clerk hire, outdoor officers, fuel, lights, &c., had to be fixed and provided for, the salaries of myself and the deputies must needs be flexible. It was arranged, that all the deputies, at the beginning of each year, should sign an agreement, by which they should render their services for the entire current year, accepting such pay therefor as the fees of the office would yield after the before-mentioned fixed expenses were paid, such salaries in no case to exceed four thousand dollars. Under this arrangement the salaries of the deputies have varied, from year to year, from $1,200 to $4,000. I have never, in any one year, received my own salary entire for that year. The salaries of the deputies, in 1876, were $4,000 each. In 1877, it was $2,550 each. The first four months of 1877 would have yielded the deputies $1,800 a year, one $2,400 a year, and myself about $3,500 a year. I submitted the whole matter to Judge Johnson personally, on my first interview with him, and he used the expression: 'I don't see, under the circumstances, how you can do any differently.' The salaries for that year amounted to $3,800, the largest; one, a half year, at $1,900; and Mr. Pentz $200 a month until he died, which, I think, was in August." On his cross-examination by the assistant district attorney, he testified as follows: "Q. What is the character of the services required of the deputies? A. They begin by assisting captains in forming their agreements with their crews. They assist captains in selecting crews on the floor. They explain to each seaman the nature of the contract. They witness and certify the signature of each seaman. They issue an advance note to each seaman and put it in his own hand, while sober. They supervise the preparation of every ship's papers outward. They supervise the putting of ship's crews on board, in difficult cases doing it in person themselves. They go on board ships in the harbor and quell mutinies and arrange disputes. When seamen are scarce, they go to neighboring ports, even as far as Chicago, to bring crews here. They examine every sailor's account, as rendered, with the captain, and correct it, when correction is needed. They arrange minor differences with seamen, in their settlement. They witness officially the discharge and payment of every seaman, while sober. They issue certificates of discharge to every seaman. They receive and pay out cash due to seamen to the amount of about $100,000 a month. They attend to all steamers on board, without troubling them to come to the office, and maintain perfect order and discipline through the building. Q. Can you state how much has been received as fees, under the schedule providing for the payment of fees for apprenticeships? A. Five dollars. Q. You have office hours each day. What are they? A. From half past 8 a. m., until 5 p. m., for indoor employees, and as much longer as may be necessary. The work often keeps them till 6 or 7 o'clock. The outdoor men have to be in readiness for duty at all hours, day and night; very frequently on duty at 4 o'clock in the morning, to get

the crews on board, to suit the tide. This will also apply to deputies. Q. Are the men, your employees, engaged every day? A. Yes, every day. Q. Won't you state generally the method by which the crews are shipped and discharged? A. A captain comes, for instance, to-day, in the morning, and opens his articles, arranges the form of agreement, with the deputy, on blanks which we have there, for the voyage which he is about to enter on. He applies to the deputy on the shipping side of the office. He signs a written request for me to furnish the crew that he requires. He appoints a time, generally, the next day, for the shipment of his crew. At the hour given, which we make known, the floor is usually well filled with sailors seeking employment at the shipping commissioner's office. The sailors must all be sober and orderly. The captain and my deputy stand behind a rail and desk. The captain selects such men as he chooses, and calls them in one by one. The nature of the voyage is thoroughly explained to the seaman, and, if my deputy knows anything bad about the man's record, the captain is informed of it before the man signs. After the whole crew have signed articles of agreement, which they do in that room, they are cautioned by my deputy to pay no blood money for their chance. This is a tax exacted by captains, mates and landlords, for supposed influence in procuring them situations. Their advance notes are then filled out. Each sailor, on leaving port on a foreign voyage, is entitled, by custom, to advance wages, for from one to two months. This is paid by what is called an advance note, given to the sailor and payable three days after the ship sails, if he is on board and earning his wages. These notes are handed to the seamen after they have shipped. This completes the shipment of seamen. After this the captain notifies the deputy the day and hour at which he wishes the crew on board for departure. The deputy details this work to our outdoor officers, who, at the proper time, gather up the sailors from their different boarding-houses, and put them on board. If, at this time, sailors are drunk and disorderly, who have shipped, they are, at the request of the captain, removed, and others taken in their places. The entire crew, being on board at the dock, sober and orderly, are mustered by my officers and examined touching their settlements with their landlords. Complaints of foul treatment, if any, are heard and reported to me. The names of all on board are checked and reported to the deputy at the office by the officer; and, at the proper time, the advance notes of all men so checked as being on board are paid, generally to the landlords, who hold the sailors' endorsements of them. Complaints of unfair dealings by such landlords are investigated and settled by the commissioner, before these notes are paid. As to the method of discharge: Twenty-four hours prior to the time for the payment of sailors' wages inward, the captain comes, bringing his accounts with his seamen, his articles of agreement, and his official log. An appointment is made with him for an hour next day, to meet these men and pay them off, at my office, which appointment is always posted on the bulletin board of the shipping hall. The deputy in the paying off department examines these accounts, each one thoroughly, and corrects them, when necessary, and then passes them over to the clerk in that department, whose duty it is to make the payment. At the hour appointed, the captain and crew meet, and, in the presence of the deputy of the department, a clerk, having first received the cash from the captain, pays to each man, into his own hand, while sober, the balance found to be due him. Small differences arising between the captains and their seamen are adjusted on the spot by the deputy. Large ones are usually referred to me, and I adjust them, parties frequently appearing by counsel. On the completion of the payment of seamen's wages, the captain and the seamen sign what is called a mutual release, and the seaman is furnished with a discharge paper, embodying his character and capacity, and the particlars of the voyage just closed. My office is 187 and 189 Cherry street. It consists of one large hall, 50 feet by 120 feet, extending from Cheery street to Water street; the commissioner's office, about 30 feet by 20 feet; and the cash department, on the lower floor, about 30 feet by 60 feet. There are four departments— shipping, paying. cash, and steamship departments. I have stated the general services performed in my office, except my own duties, which I have not touched upon. My duties consist of general supervision of all the departments, in holding arbitration courts, hearing complaints of seamen, answering correspondence touching missing seamen, from all parts of the world, and instructing ship-masters and owners. Q. I see F. C. Duncan, G. F. Duncan and C. D. Duncan on the pay roll of the shipping commissioner for 1877, the first two receiving salaries of $3,800 each and the third receiving $1,900 for six months. Are they relatives of yours? A. Sons. C. D. Duncan, my son, owned, and still owns, a plantation in Florida, from which I called him to assist me and to which he has since returned. F. C. Duncan was master of the Kate Davenport, a large ship in the East India trade, which I requested him to leave and come to my assistance. George F. Duncan was engaged in the jewelry business, and I requested his assistance also. All this in 1872, when I first came into the office."

The receipts of the shipping commissioner's office, from shipping fees, were, in 1872 (from August 1st), $15,922; in 1873, $29,762; in 1874, $41,500; in 1875, $39,200; in 1876, $23,062; in 1877, $22,625. Its receipts from paying-off fees, on discharge, were, in 1872

(from August 1st), $4,381.50; in 1873. $8,003.15; in 1874, $13.326; in 1875, $12,035; in 1876, $6,711.-25; in 1877. $5,825.25. The number of seamen shipped by the office was, in 1872 (from August 1st). 10.541; in 1873, 16,756; in 1874, 26,636; in 1875, 25,408; in 1876, 13,346; in 1877, 12,165. The number of seamen paid off by the office, on their discharge, was, in 1872 (from August 1st), 7,785; in 1873. 15.832; in 1874, 27,756; in 1875. 24,277; in 1876. 13,477; in 1877, 11,660. The amount of money paid by the office into the hands of seamen for wages due and accruing to them, was, in 1872 (from August 1st), $384.241.82; in 1873, $1,182,103.17; in 1874, $1,653,186.08; in 1875, $1,517,762.23; in 1876, $946,844.21; in 1877, $856,220.43. The amount of money collected by the office and paid into this court, for wages of deceased seamen, was, in 1872 (from August 1st), $847.56; in 1873, $3,945.10; in 1874. $3.333.58; in 1875, $1.923.69; in 1876, $3,205.28; in 1877, $1,485.80.

1. As to the allegation, that, on the deposition of the shipping commissioner, the master should have reported that the salaries, at the rate of $3,800 a year, paid to the three deputy commissioners, F. C. Duncan, G. F. Duncan and C. D. Duncan, were entirely too large for the work performed by them. There is nothing to show that any such point was taken by the district attorney before the master. Nor was any evidence introduced before the master, by the district attorney, to show that the salaries of the deputies were too large for the work performed by them. No witness expresses an opinion to that effect, nor was the shipping commissioner asked whether he could not have obtained competent persons to discharge the duties so performed for a less compensation, nor was any evidence given that he could. The arrangement made is testified to have had the sanction of each of my predecessors, Judges Woodruff and Johnson. The three deputies named were deputies from the beginning. The arrangement was one which sanctioned a salary of $4,000 to each of them, if the fees of the office would pay it. It has never exceeded that sum. The commissioner and the deputies had a right to rely on the arrangement, until it should be shown, on notice and hearing, that the salaries ought to be reduced. These observations cover the above named accounts. I do not intend to say, however, that the salaries of the deputies and of other subordinates ought not to be reduced and their number fixed for the future, nor do I intend to say that they ought. The propriety of the salaries paid was not questioned before the court by the district attorney until the report for the year 1877 was brought up, although the arrangement was fully explained by the shipping commissioner in his deposition of November 1, 1876, in regard to the accounts down to the close of 1875. Under section 4501 of the Revised Statutes. the court has power to regulate the mode of conducting business in the office of the shipping commissioner, and has full and complete control over the same. If the district attorney desires an order of reference to a master to take proof as to what the number of employees in the office of the shipping commissioner should be for the future, and what their salaries should be, and what would be a proper arrangement in regard to those matters. to be sanctioned by the court, such an order will be made.

2. As to the claim that the $572.78 should not have been allowed by the master as a charge against the receipts of 1877, I do not think the exception can be allowed. It does. not appear that the point was raised before the master. The practice was sanctioned by the district attorney, in reference to the deficiency of $657, in 1872, and in reference to the deficiency of $1,426.10 at the end of 1873, and in reference to the surplus of $126.12 at the end of 1874, and in reference to the deficiency of $433.42 at the end of 1875, by his not excepting to the report in reference to the accounts for those years. This court, in May. 1876, in Re Shipping Commissioner [Case No. 12.792]. said, in reference to the accounts down to the close of 1875: "The act in question is not a revenue law. There is in it no intention manifested to raise any revenue for the United States out of the fees to be paid under it. It is entirely consistent with its scope and purpose, that congress designed that the system established by it should be self-sustaining as to expenses and emoluments, and that any surplus thereafter of fees should be paid into the treasury, in order that congress might. in view of the amount. if any, of such surplus, so readjust the fees as to make the system no more than self-sustaining." The shipping commissioner had a right to rely on the principle, as an established one, that he would be allowed to charge the $572.78 against the receipts of 1877. If a change in that respect is to be made for the future it should be made by an order of the court. on notice and hearing.

3. As to the claim that the power of the shipping commissioner to employ clerks. granted to him by section 4505 of the Revised Statutes, does not authorize the appointment of deputy commissioners. The proceedings. before recited show that there have been deputy commissioners from the beginning. and that the propriety of their appointment has been sanctioned by the master and the court and the district attorney. Section 4505 provides. as follows: "Any shipping commissioner may engage clerks to assist him in the transaction of the business of the shipping office, at his own proper cost. and may. in case of necessity. depute such clerks to act for him in his official capacity; but the shipping commissioner shall be held responsible for the acts of every such clerk or deputy. and will be personally liable for any penalties such clerk or deputy may incur by the violation of any of the provisions of this title; and all acts done by a clerk, as such deputy,.

shall be as valid and binding as if done by the shipping commissioner." The deputies are only clerks, but it is wholly in the discretion of the commissioner to judge of the necessity of deputing such clerks to act for him. It does not appear that there has been any other appointment of deputy commissioners than such deputing of clerks as is authorized by the statute.

4. The other matters embraced in the exceptions are statements as to what is contained in the deposition of the commissioner and in the accounts.

For the reasons before stated, the matters of the exceptions, considered as objections to the confirming of the report, must be overruled, and an order must be entered confirming the report of the master in regard to the accounts for 1876, and a like order must be entered confirming the report of the master in regard to the accounts for 1877.