In re ACCOUNTS OF SHIPPING COMMISSIONER.[1]

(Circuit Court, S. D. New York. May 5, 1884.)

SHIPPING COMMISSIONERS—SALARIES AND EXPENSES—REGULATIONS.

On motion of the shipping commissioner of the port of New York for confirmation of his accounts of the receipts and expenditures of his office for the year 1882, *held*, that the payment of a salary of $3,648 to each of his three sons as deputies was unreasonable and excessive, and that for the future the following regulations should be adopted: (1) That the employment of one chief clerk, deputized, in case of necessity, to act for the shipping commissioner in his official capacity, and to be allowed a salary not to exceed $2,500 per annum, may be justified by the demands of the office, and is authorized. (2) Three other clerks, at salaries not to exceed $1,200 each, or two at salaries not to exceed $1,600 each, in the discretion of the commissioner, may also be employed. (3) All compensation received by the commissioner, or his subordinates, for services rendered during office hours to owners or masters of vessels or to seamen, are to be accounted for and returned with the receipts of the office.

In the Matter of the Confirmation of the Accounts of the Shipping Commissioner of the Port of New York.

Elihu Root, U. S. Dist. Atty.
Enos N. Taft, for shipping commissioner.

WALLACE, Circuit Judge. The immediate question presented by the report of the master, and the motion made on behalf of the shipping commissioner to confirm the report, is whether the salaries paid by the shipping commissioner to his deputies for the year 1882 were reasonable. Having filed his account of the receipts and expenses of his office for the year 1882, an order was made, pursuant to the established mode of procedure since the year 1876, by which the account was referred to a master for an examination and report to the court, upon notice to the United States attorney. Pursuant to that order, Mr. Gutman, the master, in February, 1883, filed his report, showing that the receipts of the office for the year 1882 were $22,531.50, and the expenses for the year were $22,531.50. Among the items of expenses in that account were three, of $3,648 each, paid by the shipping commissioner to his three sons, for their salaries as deputy shipping commissioners. Upon the motion to confirm that report, objection was made by the United States attorney that the salaries paid by the shipping commissioner to his deputies were excessive. Thereupon, and on the 2d of October, 1883, this court made an order referring back the report to the master, and directing him to take such proof as might be produced by the shipping commissioner and by the United States attorney, and report explicitly upon the reasonableness of these salaries. Although, since 1875, the accounts of the shipping commissioner have been returned annually, have been passed by a master, and on several

---

[1] This case has been heretofore reported in 22 Blatchf. 148, and is now published in this series, so as to include therein all circuit and district court cases, elsewhere reported, which have been inadvertently omitted from the Federal Reporter or the Federal Cases.

occasions have been objected to by the United States attorney, and considered upon such objections by my predecessors in office, this is the first instance in which those accounts have been challenged by opposing proofs on the part of the United States attorney. There is no statute which makes it the duty of the district attorney to scrutinize or challenge these accounts, and it is doubtful if he has any authority in the premises, except such as is conferred upon him permissively by the order of the court; and for this reason, probably, the predecessors of the present United States attorney deemed it beyond their province to controvert the correctness of the accounts, beyond criticising items which seemed objectionable upon their face. The last occasion when the accounts were specially investigated was in 1878, when objections were filed by the United States attorney to the accounts for the year 1877. It then appeared that the commissioner had paid to each of his three sons, for their services as deputies during that year, a salary at the rate of $3,800 per annum, two of them being paid for the whole year, and one of them for six months. Judge Blatchford, in considering the objections, and passing upon the account (16 Blatchf. 92, Fed. Cas. No. 12,793), examined with particularity the financial history of the office from its inception, and considered the principles and items of the accounts, and, referring to the question of salaries paid by the commissioner to his sons, used the following language in his opinion:

"As to the allegation that, on the deposition of the shipping commissioner, the master should have reported that the salaries, at the rate of $3,800 a year, paid to the three deputy commissioners, F. C. Duncan, G. F. Duncan, and C. D. Duncan, were entirely too large for the work performed by them, there is nothing to show that any such point was taken by the district attorney before the master. Nor was any evidence introduced before the master by the district attorney to show that the salaries of the deputies were too large for the work performed by them. No witness expresses an opinion to that effect, nor was the shipping commissioner asked whether he could not have obtained competent persons to discharge the duties so performed for a less compensation, nor was any evidence given that he could. The arrangement made is testified to have had the sanction of each of my predecessors, Judges Woodruff and Johnson. The three deputies named were deputies from the beginning. The arrangement was one which sanctioned a salary of $4,000 to each of them, if the fees of the office would pay it. It has never exceeded that sum. The commissioner and the deputies had a right to rely on the arrangement until it should be shown, on notice and hearing, that the salaries ought to be reduced. These observations cover the above-named accounts. I do not intend to say, however, that the salaries of the deputies and of the subordinates ought not to be reduced, and their number fixed for the future, nor do I intend to say that they ought."

As the objections to the accounts are now presented, am relieved from any embarrassment arising from the decisions of my predecessors, inasmuch as they were called upon to consider such objections when there was no evidence to controvert the case made by the commissioner himself, and practically only his side of the controversy was exhibited. These decisions, while authoritative, and, perhaps, conclusive as an auditing of past accounts, do not stand in the way of considering de novo the question of the reasonableness of the salaries paid in 1882, unless, as stated in the opinion of Judge Blatchford, "the commissioner and the deputies had a right to rely

on the arrangement [in the past] until it should be shown, on notice and hearing, that the salaries ought to be reduced."

The proofs taken before the master are voluminous, and embrace a wide range of investigation, notwithstanding the strenuous efforts on the part of the commissioner to narrow the field of investigation. It was quite impossible, however, to confine the proofs to the value of the deputies' services in 1882. Whether it was necessary that these deputies should be employed for that year, and what was a fair compensation for their services then, were questions which could not well be resolved without a comparison of the business and duties of the office in previous years, and the relative value of the services then and now. This led to an inquiry into the nature and extent of their services in the past, and, finally, to an extended examination into the business of the office generally, and into the duties of the commissioner, and of the deputies and the various subordinates, during the whole period of its existence. This examination has been sufficiently comprehensive and thorough to possess the court, not only with the material facts respecting the primary subject, but also concerning the past administration of the office, which it is very much to be regretted were not brought to the attention of my predecessors. It will not be profitable to attempt a recapitulation of the evidence. It is due to the shipping commissioner, however, to state that witnesses of high respectability and intelligence have commended his administration of the office generally, and approved as reasonable the salaries which he has paid his sons. The reasons why I cannot concur in their opinion, and must disapprove the findings of the master, may be briefly stated, and rest upon a few salient, but controlling, considerations.

The duties of the shipping commissioner are not intricate or arduous, but they are useful and various, and require good judgment and executive capacity. He is the responsible head of the office, and is charged with the supervision of its manifold operations, and incurs some financial risks, because he is obliged to pay the expenses of maintaining the office and of conducting its business, including rent and the pay of employés, out of the receipts of the office. He must rely exclusively upon the fees of the office to meet the expenses as well as his own salary. If these fees fall short, he has no recourse upon the treasury of the United States. The statute that creates the office provides that the salary, fees, and emoluments of the commissioner shall in no case exceed $5,000 per annum. This salary was deemed adequate, by the legislative department of the government, to compensate him for all his responsibilities and services, however onerous and exacting they might be. The duties and responsibilities of the shipping commissioner are, of course, far more important and onerous than those of any of his subordinates. Their duties are either clerical, such as those of bookkeepers or accountants, or they are services of a lower grade. The law contemplates that these duties are to be discharged by the commissioner himself, with such clerical assistance as may be necessary. It enacts that "any shipping commissioner may engage clerks to assist him in the transaction of the business of the shipping office, at his own proper

cost, and may, in case of necessity, depute such clerks to act for him in his official capacity." Rev. St. § 4505. As appears by the proofs, the services which the subordinates of the higher grades perform in the office are almost identically such as were rendered by clerks in private shipping offices in New York City. The commissioner recognized this, by selecting all his principal assistants, exclusive of his own sons, from this class of employés,—persons who had been clerks in private shipping offices. Inasmuch as his own salary and emoluments were fixed by the law at $5,000, and this standard of compensation was adopted by congress as a sufficient remuneration for his risks as well as his services, the action of the commissioner in appointing five deputies to discharge clerical duties, as soon as he had occupied the office long enough to ascertain its probable income from fees, three at a salary of $3,500 each and two at a salary of $3,000 each, starts the suggestion that he had gravely misconceived the spirit of the law under which he was to administer the office. But, when it appears that in the ensuing year (1874) these five deputies were salaried at $3,900 each, that four of them were his own sons, and that one of these sons was only 19 years old, with no more experience or qualification for the place than his years would imply, a very cogent inference arises that he had conceived a scheme for administering his office which was not only illegitimate, as a radical departure from that contemplated by law, but which was utterly repugnant to all notions of economy and decency, if it was not tainted with a corrupt motive. In 1875, these five deputies were salaried by him at $4,000 each. In 1874, after paying his own salary and those of the deputies, and the other expenses of the office, there remained, out of receipts of fees amounting to $55,000, the sum of $126 to be paid into the treasury of the United States. In 1875 the fees were $51,000, and $433 less than the expenses. From 1875 to the present time the expenses of each year have absorbed the receipts. The theory of the shipping commissioner is that, with the concurrence of Judge Woodruff, he made an arrangement with his deputies by which a salary of $4,000 a year to each of them was to be allowed when the fees of the office would pay it, because the receipts of the office were fluctuating, and at times the salaries would, therefore, have to be much less; and it appears that in 1876 they were allowed only $2,450 each, the receipts having fallen in that year to the sum of $29,774. Yet in 1877, when the receipts were still less, the deputies' salaries were allowed at $3,800 each; and it is noticeable that in this year there were but four clerks employed in the office, and they were only paid in the aggregate the sum of $2,587. In 1878 the number of deputies was reduced to four, the four sons of the shipping commissioner being retained, and they were paid $3,800 each. Subsequently one of them retired, and since then three deputies have been retained, all of them the sons of the commissioner. In 1882, the year specially under consideration, these three deputies have been paid $3,648 each, while the pay roll shows that only two clerks were employed, one of whom was paid $960, and one $655, and the receipts of the office were $22,531, which are just balanced by the expenses.

These figures, standing alone, are a sufficient commentary upon the extravagance and impropriety of the arrangement respecting deputies and their salaries which was made by the shipping commissioner, and which, according to his statement, was approved by Judge Woodruff. But it is now shown by the testimony that during all these years, until 1881, there were experienced and competent clerks employed in the office by the commissioner who were not only fully qualified to perform the services of the deputies, but who actually did perform substantially the same services, at salaries of from $20 to $25 per week; and the proofs also show that such compensation is what is generally allowed for similar services in the private shipping offices of New York City.

In view of this testimony, there can be but one of two conclusions, —either that the commissioner has been so blinded by parental interests that he could not exercise an intelligent judgment respecting the economical and decorous administration of his office, or he has corruptly exercised his powers and opportunities to farm out its revenues as spoils for family distribution.

The idea that Judge Woodruff, or either of my other predecessors in office, would have sanctioned such a state of affairs as is now shown to have existed, is not to be harbored for a moment. They were misled, undoubtedly, by a plausible presentation of the facts on the part of the shipping commissioner, and were called upon to decide upon an ex parte hearing, or upon proofs which did not exhibit any countervailing evidence.

The following general conclusions are reached, and, under the power of this court to regulate the mode of conducting the business of the shipping office, will for the present be adopted as rules for the regulation of the business of the office:

(1) That the employment of one chief clerk, deputized, in case of necessity, to act for the shipping commissioner in his official capacity, and to be allowed a salary not to exceed $2,500 per annum, may be justified by the demands of the office, and is authorized.

(2) Three other clerks, at salaries not to exceed $1,200 each, or two at salaries not to exceed $1,600 each, in the discretion of the commissioner, may also be employed.

(3) All compensation received by the commissioner or his subordinates, for services rendered during office hours to owners or masters of vessels or to seamen, are to be accounted for and returned with the receipts of the office.

Although the master's report must be disapproved, the court has no power to compel the shipping commissioner to pay into the treasury of the United States any fees which he has not sufficiently accounted for. Although the court is empowered to regulate the mode of conducting the business of the office, and is invested with complete control of the same, its powers are supervisory, not plenary, and it acts in an administrative, rather than in a judicial, capacity. The receipts of the office belong to the United States. The government can claim them or relinquish them at its option. If they have been misappropriated, the United States can sue for them and recover them. The court is not a competent party to such a contro-

versy. Nor should the court undertake to adjudicate upon the rights of the shipping commissioner, or of the government, in a proceeding to which the United States are not a party, because its judgment would not conclude either. The government is not a party merely because the United States attorney has intervened in the proceeding at the direction of the court. He did not come into the proceeding by the authority of any statute which expressly or by implication makes it his duty or his privilege to represent the United States, nor did he appear upon the retainer or at the request of any department of the government which can be deemed to represent the United States. When a suit is brought to which the United States are a party to the record, all the questions of fact and law upon which the government and the shipping commissioner are entitled to be heard can be appropriately and conclusively determined. So far as the latter has acted conformably to regulations prescribed by this court, he will be, undoubtedly, protected, because the administrative power to make the regulations is lodged with the court; and it may be well urged that it is immaterial whether his acts have received a subsequent sanction, or were sanctioned in advance. It is not necessary, nor is it expedient, to express any opinion now as to whether the shipping commissioner was justified in assuming, from the action of my predecessors prior to 1882, that he was authorized to retain his sons as deputies and pay them the salaries he has paid them. If a suit shall be brought, it may become pertinent to inquire whether such action was induced by misrepresentations or suppressions of material facts on the part of the shipping commissioner, which were intended and effectual to mislead. Neither is it intended by the present decision to preclude him from a full opportunity of reviewing and overturning the conclusions of fact which have been reached and expressed in the present proceeding.

The statute authorizes the court to remove from office any shipping commissioner "whom the court may have reason to believe does not properly perform his duties." Rev. St. § 4501. The permissive language in such a statute is mandatory. Where power is devolved by statute upon a public body or officer to do an act which concerns the public interests, its exercise is an imperative duty whenever the occasion calls the power into activity. What my impression is respecting the official conduct of Mr. Duncan, upon the proofs and records used upon this motion, has been sufficiently indicated; but he is entitled to a full hearing, and should be given an opportunity, if he desires to retain the office, to show that he has properly performed his duties.

An order will be entered denying the motion to pass the accounts for 1882, and directing the shipping commissioner to show cause before me, on the 10th day of May next, at 10:30 a. m., why he should not be removed from office.